1    VENABLE LLP
     DANIEL S. SILVERMAN (SBN 137864)
2    Email:   dsilverman@venable.com
     2049 Century Park East, Suite 2100
3    Los Angeles, CA 90067
     Telephone: (310) 229-9900
4    Facsimile: (310) 229-9901

5    THOMAS J. MANGO (*pro hac vice* pending)
     Email:     tmango@cantorcolburn.com
6    MICHAEL J. RYE (*pro hac vice* pending)
     Email:     mrye@cantorcolburn.com
7    CANTOR COLBURN LLP
     20 Church Street, 22nd Floor
8    Hartford, CT 06103
     Telephone: (860) 286-2929
9    Facsimile: (860) 286-0115

10    Attorneys for Defendant
     MAXIMUM HUMAN PERFORMANCE, LLC

11

12            **UNITED STATES DISTRICT COURT**

13      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15   CROSSFIT, INC., a Delaware Corporation | CASE NO. 3:12-cv-02348 BTM MDD |
| 16           Plaintiff, | **DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| 17        v. | |
| 18   MAXIMUM HUMAN PERFORMANCE, LLC, a Delaware LLC, | |
| 19 | |
| 20           Defendant. | **Date:**       **November 9, 2012** <br> **Time:**      **11:00 a.m.** <br> **Ctrm:**      **15** |
| 21 | **Complaint filed: September 25, 2012** |

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.   FACTUAL BACKGROUND ..................................................... 3

  A.   MHP's Selection and Registration of the X-FIT Mark ................. 3

  B.   MHP's Marketing of Products in Connection with the X-Fit Mark  4

  C.   MHP's Prior Resolution with CrossFit ............................ 6

  D.   CrossFit's Allegations in the Motion Are Misleading .................. 9

       1.   No New Marketing Materials Were Added After the
            Matter was Resolved ........................................ 9

       2.   CrossFit Has No Rights In Exercise Terminology and
            Movements ................................................ 10

  E.   CrossFit's Lack of Enforcement ................................. 11

       1.   Coexistence with Third Party CrossFit Marks and
            Allowance of Use ......................................... 11

       2.   Coexistence with Third Party X-FIT Marks.................. 11

II.  ARGUMENT ...................................................... 12

  A.   CrossFit is Not Likely to Prevail on the Merits .................... 12

       1.   CrossFit Cannot Satisfy the Ninth Circuit Likelihood of
            Confusion Standard ....................................... 13

            i.    CrossFit is not a strong mark  ..................... 14

            ii.   The proximity of the goods ........................ 15

            iii.  The lack of similarity of the marks favors MHP ....... 15

            iv.   There is no evidence of actual confusion ................. 16

            v.    The marketing channels used ...................... 16

            vi.   The type of goods and degree of care by purchaser ... 17

            vii.  The Defendant's intent favors MHP ................... 17

            viii. The likelihood of expansion of the product
                  line favors MHP.................................. 18

       2.   MHP'S Use of the CROSSFIT Mark is Permissible
            Fair Use................................................. 18

       3.   CrossFit Cannot Prove Its Dilution Claim ...................... 20

i

6152873-v1

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

B.  CrossFit is Unable to Prove Irreparable Harm  .......................... 21

C.  CrossFit Has Delayed in Seeking an Injunction  ......................... 22

D.  The Balance of Hardships and the Public Interest Do Not
Favor CrossFit ........................................................................... 24

III.  CONCLUSION ...................................................................................... 25

**VENABLE LLP**
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6152873-v1

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Active Network, Inc. v. Electronic Arts Inc.,*
  2010 WL 3463378 (S.D. Cal. Aug. 31, 2012) ............................ 13

4

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...................................... 24

5

*AMF, Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979) .............................. 13, 15-17

6

*Amoco Production Co. v. Village of Gambell, Alaska,*
  480 U.S. 531 (1987)................................................ 24

7

8

*Board of Regents, University of Texas System ex rel.*
*University of Texas at Austin v. KST Elec. Ltd.,*
  550 F. Supp.2d 657 (W.D. Tex. 2008)................................ 21

9

10

*Brookfield Commc'n, Inc. v. West Coast Entm't Corp.,*
  174 F.3d 1036 (9th Cir.1999) ...................................... 15

11

*Cal. Pharmacists Ass'n v. Maxwell–Jolly,*
  596 F.3d 1098 (9th Cir.2010) ...................................... 24

12

*Caribbean Marine Servs. Co. v. Baldridge,*
  844 F.2d 668 (9th Cir.1988) ....................................... 21

13

*Conant v. McCaffrey,*
  172 F.R.D. 681 (N.D. Cal. 1997).................................... 22

14

*ConocoPhillips Co. v. Gonzalez,*
  2012 WL 538266 *4 (N.D. Cal. Feb. 17, 2012) ................... 21, 23

15

*Dahl v. Swift Distribution, Inc.,*
  2010 WL 1458957 *12 (C.D. Cal. Apr. 1, 2010) ..................... 25

16

*Dep't of Parks & Rec. v. Bazaar DelMundo, Inc.,*
  448 F.3d 1118 (9th Cir. 2006) ..................................... 13

17

*eAcceleration Corp. v. Trend Micro, Inc.,*
  408 F.Supp.2d 1110 (E.D.Wash. 2006) ........................... 17, 22

18

*Eclipse Assocs. Ltd. v. Data Gen. Corp.,*
  894 F.2d 1114 (9th Cir. 1990) ..................................... 14

19

*Edge Games, Inc. v. Elec. Arts, Inc.,*
  745 F. Supp. 2d 1101 (N.D. Cal. 2010) ............................. 22

20

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,*
  654 F.3d 989 (9th Cir. 2011) ...................................... 12

21

22

23

24

25

26

27

28

**V E N A B L E   L L P**
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

DEFT'S MEMO OF Ps&As IN OPPO TO PLTF'S
MOTION FOR PRELIMINARY INJUNCTION

6152873-v1

*Fruit of the Loom Inc., v. Girouard,*
    994 F.2d 1359 (9th Cir.1993) ............................................................ 20

*Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.,*
    559 F.3d 985 (9th Cir.2009) .............................................................. 24

*Keep a Breast Found. v. Seven Group,*
    2011 WL 2940290 (S.D. Cal. July 19, 2011) ...................................... 12

*Marketquest Group, Inc. v. BIC Corp.,*
    2011 WL 5360899 (S.D. Cal. Nov. 7, 2009) ........................................ 12

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir.2009) .............................................................. 12

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ......................................................................... 12

*Moose Creek, Inc. v. Abercrombie & Fitch Co.,*
    331 F. Supp. 2d 1214 (C.D. Cal. 2004) aff'd, 114 F. App'x 921 (9th Cir. 2004) ....... 14

*Network Automation, Inc. v. Advanced Sys. Concepts,*
    638 F.3d 1137 (9th Cir. 2011) ....................................................... 13, 17

*New Kids on the Block v. New America Pub., Inc.,*
    971 F.2d 302 (9th Cir. 1992) ............................................................. 18

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,*
    762 F.2d 1374 (9th Cir.1985) ............................................................ 23

*One Indus., LLC v. Jim O'Neal Distrib., Inc.,*
    578 F.3d 1154 (9th Cir. 2009) ........................................................... 14

*Perfumebay.com Inc. v. eBay, Inc.,*
    506 F.3d 1165 (9th Cir. 2007) ........................................................... 15

*Playboy Enterprises, Inc., v. Welles,*
    279 F.3d 796 (9th Cir. 2002) ............................................................. 19

*Rebelution, LLC v. Perez,*
    732 F. Supp. 2d 883 (N.D. Cal. 2010) ................................................ 14

*Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n,*
    208 F. Supp. 2d 1058 (C.D. Cal. 2000) ............................................... 20

*Sykes Laboratory, Inc. v. Kalvin,*
    610 F.Supp. 849 (C.D.Cal.1985) ....................................................... 21

*Toyota Motor Sales, U.S.A., Inc., v. Tabari,*
    610 F.3d 1171 (9th Cir. 2010) ........................................................... 19

*Visa Int'l Serv. Ass'n v. JSL Corp.,*
    610 F.3d 1088 (9th Cir. 2010) ........................................................... 20

**VENABLE LLP**
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

iv

6152873-v1

*Winter v. Natural Res. Def. Council, Inc.,*
 555 U.S. 7 (2008).................................................................................................... 24


**SECONDARY SOURCES**

4 McCarthy on Trademarks and Unfair Competition § 24:105 (4th ed.) .............................. 20

**V E N A B L E   L L P**
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

v

6152873-v1

1    Defendant Maximum Human Performance, LLC ("MHP") herby opposes

2   Plaintiff CrossFit, Inc.'s ("CrossFit") Motion for Preliminary Injunction

3   ("Motion") seeking to enjoin MHP from any use of its mark X-FIT in connection

4   with videos for exercise instruction that state or imply an association with CrossFit.

5   CrossFit is attempting to broadly lay claim to rights over the use of "X-Fit",

6   despite the fact that it has previously acknowledged that others, including MHP,

7   have rights in the mark.  In fact, MHP has two federal trademark registrations for

8   the mark X-FIT in connection with its nutritional supplements.  Remarkably,

9   CrossFit attacks MHP's use of X-Fit, despite the fact that CrossFit's direct

10   competitor owns an X-Fit registration that is senior to CrossFit's use.  Further, the

11   complained-of videos have been present for many months, MHP has fully

12   cooperated with CrossFit to address its previously stated concerns and believed the

13   matter to be resolved.  If a party is acting in bad faith, it is CrossFit.

14    Since 1997, MHP has developed premier science-based, research driven

15   sports supplements to help world-class athletes, pro bodybuilders, power lifters,

16   fitness enthusiasts, and other athletes achieve their greatest physical potential.

17   MHP sells approximately one-hundred different products.  In September of 2011,

18   MHP began selling supplements with the mark X-FIT, which is an acronym for

19   "Extreme Fitness Intensity Training".  MHP owns common law rights and federal

20   trademark registrations for its X-FIT, X-FIT TRAINER and X-FIT POWER marks

21   (collectively, the "X-FIT Marks") used in connection with dietary and nutritional

22   supplements.  As it does with its other products, MHP markets X-FIT supplements

23   to the entire sports and nutrition industry, and MHP uses athletes, videos, and

24   sponsorships to help promote its supplements.  Other third party X-Fit marks are

25   also federally registered trademarks – including one in direct competition with

26   CrossFit that is senior to CrossFit's rights.

27

28

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

1

1    CrossFit is a cross-training philosophy and licensing organization that

2    contracts with gyms, called "Affiliates" and licensees called "Box Owners".

3    CrossFit is a participant in the niche "High Intensity Cross-Training" ("HICT")

4    segment of the much larger sports and fitness market, which itself is a small part of

5    the sports and nutrition industry.  CrossFit enthusiasts make up a very small

6    percentage of the market that MHP targets with its X-FIT supplements.

7    

8    Beginning in January 2012, MHP and CrossFit began discussing the issues

9    raised in CrossFit's Complaint and Motion related to its mark CROSSFIT

10   ("CROSSFIT Mark").  After several communications between the parties, and

11   voluntary changes made to MHP's website, the discussions culminated with the

12   parties reaching a resolution to CrossFit's stated concerns on August 1, 2012.  At

13   that time, CrossFit claimed it had reviewed MHP's website -- which included the

14   now complained-of videos -- stated that it was satisfied with changes made, and

15   considered this matter resolved.  The parties further agreed that should any issues

16   arise in the future, they would contact each other directly to avoid litigation, and

17   agreed to prepare joint press releases to address MHP's concerns that CrossFit had

18   been falsely informing customers that CrossFit had sued MHP for trademark

19   infringement.

20   Then, nearly two months later and without warning, CrossFit filed its

21   Complaint and Motion for Preliminary Injunction on September 26 and 27, 2012,

22   respectively.  [Docket Index ("D.I."), 1 and 5]  Beyond filing the Motion in bad

23   faith after approving the now complained-of use and by failing to honor its

24   agreement, CrossFit cannot make the required showing for the broad preliminary

25   injunctive relief it is seeking because it is not likely to succeed on the merits and it

26   cannot show irreparable harm.  Specifically, the marks CROSSFIT and X-FIT are

27   not confusingly similar, particularly where "X" means "Extreme" in the sports and

28   nutrition industry, CrossFit acknowledged the differences between the marks,

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

2

goods and services, and admitted that CrossFit cannot enforce against X-FIT marks.  Further, the mark CROSSFIT is not famous; rather, it is a weak niche mark.  CrossFit has further weakened the CROSSFIT Mark by failing to enforce its newly claimed trademark rights by allowing widespread use of both CROSSFIT and X-FIT.  Accordingly, CrossFit's Motion should be denied.

# I.     FACTUAL BACKGROUND

## A.     MHP's Selection and Registration of the X-FIT Mark

In 2011, MHP developed a nutritional supplement that targets consumers in the broad sports and nutrition market.  [Declaration of Steve Downs ("Downs Decl."), ¶6.]  MHP ultimately decided on the mark "X-Fit" for the product, an abbreviation for "Extreme Fitness Intensity Training".  [Downs Decl., ¶7.]  MHP selected "X" for "Extreme" because "X" is commonly used as "extreme" in the sports and nutrition industry.  [Downs Decl., ¶8.][1]  For example, the "Extreme Games" are now called the "X Games", which, in 2011, had approximately 141,500 people in attendance and was watched on television by 37 million more.

[1]     A review of the United States Patent and Trademark Office ("USPTO") database revealed the following examples: U.S. Trademark Registration Nos. 2747704 for X ADE XTREME THIRST QUENCHER GET IT BACK!, 3393807 for X ACAI XTREME SPORTS covering sports drinks; 3043042 for XS EXTREME SPORTS, 3802580 for A X XTREME ATHLETE TECHNOLOGY, 2745495 for XS covering clothing; 3465625 for STIMULANT X XTREME ENERGY & FAT LOSS TECHNOLOGY for nutritional supplements; 3626489 for BEN JACKSON'S X-TREME FIGHT NIGHT, 3690498 for X XFC XTREME FIGHTING CHAMPIONSHIPS for entertainment services; 4094097 for EXTREME CONDITIONING X EXTREME RESULTS covering exercise machine; 4135246 for TEAM X T.R.E.M.E. TRAIN. REHABILITATE. EMPOWER. MOTIVATE. ENDURE. covering charitable services; 3955218  for R.U.X.S. RUCKUS UNDERGROUND X-TREME SPORTS covering extreme sport publications, 3401592 for OPERATION X-SPORTS covering facilities; 3584037 for X SKIM X covering extreme water skimming and extreme hydroplaning; and U.S. Trademark Application Nos. 85514711 for X MAX EXTREME ENERGY covering energy drinks, 77501882 for SKIM X covering extreme water skimming and extreme hydroplaning.  [Declaration of Craig R. Larsen ("Larsen Decl."), ¶¶5-19, Exs. 1-15.]

A review of the Internet using the search engine, Google, revealed the following examples: X-TREME ROCK CLIMBING for rock climbing; XTREME PAINTBALL for paintball; LAZER XTREME for laser tag; XTREME ATHLETICS, EXTREME X-FIT FITNESS CLUB, XTREME FIT STUDIO, XTREME FITNESS, OS XTREME FITNESS, GYM XTREME , XTREME FAMILY FITNESS, XTREME FITNESS for fitness facilities; XTREME FITNESS for nutritional supplements and fitness plans; ATHLETIC XTREME, ACTIVATE XTREME and LEAN XTREME for nutritional supplements; BE WARM X for clothing; X-TREME SCRAMBLE SERIES for Hartford Marathon Foundation events; XTREME FITNESS BOOT CAMP, P90X EXTREME HOME FITNESS for fitness programs; XTREME FITNESS, LLC for fitness training.  [Downs Decl., ¶¶9-27, Exs. 1-19.]

V E N A B L E  L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

3

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

1  [Downs Decl., ¶¶28—31, Exs. 20-22.]  Further, as MHP found with its federally

2  registered XERO LIMITS trademark, U.S. Reg. No. 3544974, the use of "X" is

3  "cool" and appealing to consumers.  [Downs Decl., ¶¶32-33, Ex. 23.]  MHP's use

4  of "X" in the X-FIT Mark has always been used as and about "Extreme" and has

5  never been used as, or relating to, "Cross".  [Downs Decl., ¶34.]  "X-FIT" and

6  "Xtreme Fitness Intensity Training" appear together throughout MHP's website at

7  http://www.mhpx-fit.com and on the product's packaging.  [Downs Decl., ¶¶35-37,

8  Exs. 24-25.]

9      During the prosecution of MHP's trademark applications for the X-FIT

10  Marks, the USPTO did not find a likelihood of confusion between the parties'

11  marks.  [Larsen Decl., ¶20.]  As a result, MHP owns both common law and

12  federally-registered rights to its X-FIT Marks used in connection with dietary and

13  nutritional supplements.  [Larsen Decl., ¶21.]  MHP owns U.S. Trademark

14  Registration Nos. 4123070 for the mark X-FIT (Stylized) and Design and 4159216

15  for the mark X-FIT TRAINER for "Dietary and nutritional supplements".  [Larsen

16  Decl., ¶¶22-24, Exs. 16-17.]

17  **B.    MHP's Marketing of Products in Connection with the X-FIT**

18       **Mark**

19      While CrossFit is targeted to a niche class of consumers and uses limited

20  marketing channels, MHP targets X-FIT supplements to a much broader class of

21  consumers and uses marketing channels that cover the entire sports and nutrition

22  industry.  [Downs Decl., ¶¶38-39.][2]  MHP sells its X-FIT supplements in

23

24  [2]      MHP's marketing has included (1) press releases to Fitness Rx Men, Reps, Men's Workout/EH, Ironman,

25  Men's Fitness, Muscle & Fitness, Inside Fitness, Status Fitness, Muscle & Body, Muscle & Performance, Fitness

RX Men/MD, Muscle & Fitness/Flex, Planet Muscle, Muscle Mag/Reps, Powerlifting USA, and Exercise &

26  Health/Men's Workout, (2) advertising in Reps/Max Fit, Exercise & Health, Muscle & Fitness, Men's Workout,

USA Sports, Muscle & Body, Ironman, Fitness RX for Men, Men's Fitness, Europa, GNC Franchise Book, Muscle

& Performance, Lone Star, Extreme Forces, Oxygen, GNC Convention Book, Muscle Mag, Muscle & Fitness Hers,

27  Fit 3D Magazine, Football Stories, UFC Magazine, Fitness Trainer, Box Life Magazine, Reps, Physique 3D, MMA

Fitness, Train Hard-Fight Easy, Pantheon Games Program, Fighters Only, and Fitness Rx Hers, and (3) web banners

28                                                                        (continued...)

traditional retail stores, within an MHP branded section, and via the Internet. [Downs Decl., ¶40.]  MHP does not sell any services in connection with its X-FIT Marks.  [Downs Decl., ¶41.]

MHP also uses a variety of eight athletes and a NASCAR Pit Crew to promote and endorse its X-FIT supplements.  [Downs Decl., ¶¶51-53, Exs. 35-36.] Although three of the eight athletes promoting X-FIT have some connection to CrossFit, the five others do not, and include IFBB physique professionals, a powerlifting professional, a fitness model, and a UFC Heavyweight and MMA fighting professional.  [Downs Decl., ¶54.]  Regarding those athletes connected to CrossFit, who also promote MHP's X-FIT supplements, the MHP website accurately describes the athletes as "CROSSFIT® INSTRUCTOR", "BOX OWNER", and/or "CROSSFIT® COMPETITOR in their bio's, properly attributes the mark to CrossFit by using the ® and a statement that it is a federally-registered mark, and includes the following disclaimer that the parties are not associated: "*CrossFit® is a registered trademark of CrossFit, Inc. CrossFit, Inc. is not affiliated with Maximum Human Performance, LLC, and does not endorse, sponsor or otherwise support Maximum Human Performance, LLC or its products."  [Downs Decl., ¶¶55-57, Ex. 35.]

MHP uses videos to promote many of its products, including its X-FIT supplements.  [Downs Decl., ¶58.]  The goal of MHP's videos is to increase consumer interest and excitement in the supplement.  [Downs Decl., ¶59.]  To sell MHP's products, they use the videos to tell a story of what the supplement can do for the consumer by giving examples of training and lifestyles of its promotional

---

(continued)

on Muscle & Fitness and Discount Sport Nutrition.  See representative samples of press releases, advertisements, and web banners, with most featuring non-CrossFit connected athletes and none using the CROSSFIT Mark. [Downs Decl., ¶¶42-50, Exs. 26-34.]

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

5

6152873-v1

1  athletes.  [Downs Decl., ¶60.]  There is an industry-wide use of videos for Extreme

2  Fitness Intensity Training, HICT, cross-training, and strength training, and if MHP

3  did not use the videos to help promote its products, MHP would be at a

4  competitive disadvantage.  [Downs Decl., ¶¶61-62.]

5      MHP has also sponsored a variety of trade shows and events since its

6  inception in 1997 to promote and market its products, including its X-FIT

7  supplements.  [Downs Decl., ¶63.][3]  In fact, MHP has sponsored various CrossFit

8  events in 2011 and 2012 as the headline sponsor, by providing prizes or athlete

9  packages, and by staffing a booth or with signage including, but not limited to, the

10  following CrossFit events: The Nasty Northeast Throwdown, CrossFit Affiliate

11  Cup, CrossFit "Got Total?," Winter Open, Love Summer Classic, 31 heroes

12  Charity Workout, The Pump Games Presented by MHP X-FIT, Beast of the East,

13  Bay Area Beatdown, The Pantheon Games, Capital Games, and Toys for Tots

14  Wod.  [Downs Decl., ¶¶70-71.]

15      **C.    MHP's Prior Resolution with CrossFit**

16      In January 2012, MHP received information from Facebook that CrossFit

17  made a claim of infringement regarding the content of MHP's Facebook page for

18  MHP's X-FIT supplements.  [Larsen Decl., ¶25.]  On January 26, 2012, MHP's in-

19  house counsel, Craig R. Larsen ("Mr. Larsen"), promptly contacted CrossFit and

20  requested that CrossFit clarify the issue.  [Larsen Decl., ¶26.]  CrossFit responded

21  by noting MHP's willingness to cooperate and by raising an issue with MHP's use

22  of its X-FIT TRAINER Mark.  [Larsen Decl., ¶27.]

23

24 ─────────────────────────

25  [3]    See, for example, representative samples of MHP's marketing materials used in
   connection with trade shows and events including the "Brian Shaw", CrossFit Love, Emerald

26  Cup, Europa CT, Europa Dallas, Europa Get Fit, Kurt Angle, Lonnie Teper, Vitamin Shoppe
   Conference, Liberty Strongman, Olympia, Atlantic States, Garden State, Ronnie Coleman, RPS

27  World Power, Southern States, Team U, and BB.com.  [Downs Decl., ¶¶64-69, Exs. 37-42.]

28

V E N A B L E  L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

DEFT'S MEMO OF Ps&As IN OPPO TO PLTF'S
MOTION FOR PRELIMINARY INJUNCTION

6152873-v1

On February 28, 2012, without further communications, CrossFit sent a cease and desist letter ("Letter") to MHP regarding MHP's use of the X-FIT Marks in connection with supplements. [Larsen Decl., ¶28.] MHP contacted CrossFit's in-house counsel, Dale Saran ("Mr. Saran"), to discuss the Letter. [Larsen Decl., ¶29.] On April 3, 2012, MHP's outside counsel, Cantor Colburn LLP, spoke with Mr. Saran, who identified CrossFit's concerns, discussed peaceful coexistence, and agreed to continued discussions. [Larsen Decl., ¶30.]

In March and April 2012, MHP made a number of voluntary changes to its website to satisfy CrossFit's stated concerns. [Larsen Decl., ¶31.] When describing its athletes who also have connections to CrossFit, MHP now includes the ®, proper attribution and ownership of the CROSSFIT Mark, and the disclaimer described above. [Larsen Decl., ¶25, Downs Decl., ¶¶55-57, Ex. 35.] During this time, MHP also removed webpages -- including that complained of in Plaintiff's Exhibit 11 in support of its Motion. [Larsen Decl., ¶33, D.I., 5.4, Ex. 11, which is dated January 12, 2012.] MHP voluntarily made other changes to eliminate any potential association with CrossFit by renaming videos, adding text to educate consumers that the source of X-FIT supplements is MHP, and to further emphasize that "X" means "Extreme". [Larsen Decl., ¶34.] See Larsen Decl. for complained-of videos "X-FIT Daily Workout __" renamed as "XTREME FITNESS INTENSITY TRAINING __" and use of "X-FiT = Xtreme Fitness Intensity Training". [Larsen Decl., ¶¶35-41, Exs. 18-23, D.I., 5.2, Exs. 5b, d, e, f, g, and i.]

On May 10, 2012, Mr. Larsen of MHP and its outside counsel spoke directly with Mr. Saran of CrossFit to identify all changes and efforts by MHP to resolve Crossfit's concerns. [Larsen Decl., ¶42.] Mr. Saran admitted that the Letter was "over the top" and over-reaching, acknowledged that others, including MHP, can use "X-FIT" marks, and that MHP and CrossFit can coexist without confusion because the goods and services are not similar. [Larsen Decl., ¶¶43-44.] Mr.

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

7

1    Saran agreed that he would review the MHP website and that he would let MHP

2    know if he thought any additional changes were necessary to resolve the situation.

3    [Larsen Decl., ¶45.]

4         On June 5, 2012, MHP's outside counsel wrote Mr. Saran to schedule a

5    follow-up call regarding his review of MHP's website, and a Press Release

6    concerning the false statements by CrossFit that it had filed suit against MHP.

7    [D.I., 5.4, Ex. 13.] On June 14, 2012, long after the complained-of videos were

8    posted on MHP's website, Mr. Saran responded that CrossFit did not file any law

9    suit against MHP. Id. Mr. Saran further stated that "I've looked at the website

10   [MHP's website] and while I can't give you line by line at the moment, things are

11   obviously very close to being resolved from where I sit." Id.

12        Despite MHP's attempts to finalize the resolution and proposed Press

13   Release, including emails and calls to Mr. Saran, he did not respond again to MHP

14   during June or July, 2012. [Larsen Decl., ¶46.] Finally, on August 1, 2012, Mr.

15   Saran spoke with Mr. Larsen and MHP's outside counsel. [Larsen Decl., ¶47.]

16   Mr. Saran stated that he reviewed the MHP website and acknowledged that MHP

17   has "made a good number of changes", that CrossFit is "ok" with MHP's use of

18   the mark CROSSFIT, and that CrossFit appreciates MHP's efforts to resolve this

19   matter. [Larsen Decl., ¶48.] Mr. Saran and Mr. Larsen agreed that if any issues

20   were to arise in the future, Mr. Saran would contact Mr. Larsen directly to attempt

21   to resolve the concern. [Larsen Decl., ¶49.]

22        Mr. Saran also admitted that he was aware of a gym in New York that owns

23   the trademark registration for X-FIT for fitness services—the same services

24   provided by CrossFit—and has senior rights over CrossFit because of earlier use.

25   [Larsen Decl., ¶50.] He also acknowledged that he needs to educate the "CrossFit

26   community" that their mark is CROSSFIT and they cannot enforce it against X-

27   FIT. [Larsen Decl., ¶51.] Mr. Saran also advised that he was preparing an article

28   to educate the CrossFit community that its mark is CROSSFIT, and not X-FIT.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA 90067
310-229-9900

8

6152873-v1

[Larsen Decl., ¶52.]  See Mr. Saran's article ("Saran's Article") dated August 2012, which is consistent with his statements during the August 1st call.  [Larsen Decl., ¶53, Ex. 24.]

Mr. Larsen also raised the issue of CrossFit employees interfering with MHP's business relationships by falsely asserting that CrossFit sued MHP. [Larsen Decl., ¶54.]  Mr. Saran and Mr. Larsen agreed that the parties would finalize language for a press release stating that "all disputes have been resolved" and that CrossFit did not file a lawsuit against MHP.  [Larsen Decl., ¶55.]  When Mr. Saran was asked to prepare and execute a coexistence agreement as part of the resolution of this matter, he said that it was not necessary because CROSSFIT and X-FIT are not in the same class of use, are used in connection with goods and services in different markets, and, therefore, there is no coexistence of the marks. [Larsen Decl., ¶56.]

**D.    CrossFit's Allegations in the Motion Are Misleading**

**1. No New Marketing Materials Were Added After the Matter was Resolved**

Since CrossFit's approval of all of MHP's website and marketing materials on August 1, 2012, MHP has not added any new materials that could potentially cause an association between the parties.  [Larsen Decl., ¶57, Downs Decl., ¶72.] Each of the complained-of videos was posted several months before the parties came to an agreement on August 1st.  [Downs Decl., ¶73.]  In its Motion, CrossFit complains about MHP's use of the following videos: X-FIT Challenge at the Arnold Classic 2012, which was posted on March 12, 2012, X-FIT Daily Workout 101, posted on February 24, 2012, X-FIT High Intensity Training video series introduction - Daniel "Boomsauce" Tyminski, posted on February 8, 2012, X-FIT Daily Workout 105, posted on February 24, 2012, X-FIT Daily Workout 106, posted on March 21, 2012, X-FIT Daily Workout 108, posted on March 21, 2012, X-FIT Daily Workout 118, posted on June 20, 2012, X-FIT Cup Challenge, posted

9

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

on or about February 17, 2012, and X-FIT Daily Workout 103, posted on February 24, 2012.  [Downs Decl., ¶74.]  As set forth above, all of the "X-FIT Daily Workouts" are now renamed as "XTREME FITNESS INTENSITY TRAINING". [Larsen Decl., ¶¶35-41, Exs. 18-23, D.I., 5.2, Exs. 5b, d, e, f, g, and i.]

### 2. CrossFit Has No Rights In Exercise Terminology and Movements

CrossFit's claims that its training philosophy is "revolutionary" and it has "developed" unique terminology and movements that are only associated with CrossFit are unfounded and misleading.  [Downs Decl., ¶75.]  To the contrary, virtually all of the terminology and movements utilized by CrossFit are common and derived from other prior sources and/or used by others selling fitness services and supplements.  [Downs Decl., ¶76.]  For example, almost a decade ago, MHP's Steve Downs authored numerous exercise and training articles in Men's Exercise and Exercise For Men Only magazines regarding "functional fitness", which CrossFit claims is the basis of its "revolutionary" training.  [Downs Decl., ¶77.]

In its Motion, CrossFit claims that MHP is using various terms and movements that are unique and only associated with CrossFit.  For example, CrossFit raises the following terms: "workout of the day" or "WOD", "wall ball", "thrusters", "burpee", "hand release pushups", "toes to bar", and "box jumps".  [D.I., 5.1, pp. 2, 7-9.]  However, the complained-of terminology and movements that CrossFit asserts are its own, have been used for many years and are currently being used in connection with many other fitness programs and sports.  [Downs Decl., ¶78.]  For example, there has been widespread past and current use of "workout of the day" or "WOD", "wall ball", "thrusters", "burpee", "hand release pushups", "toes to bar", "box jumps", "high-intensity interval training", "Tabata sequence", "functional training", and "peripheral heart action".  [Downs Decl., ¶¶79-99, Exs. 43-63.]

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

10

6152873-v1

E.     **CrossFit's Lack of Enforcement**

1.     **Coexistence with Third Party CrossFit Marks and Allowance of Use**

In support of its claim that it enforces its mark, CrossFit relies on its lawsuit and preliminary injunction against a former CrossFit Affiliate in *CrossFit v. David Nielsen, American Boxing & Fitness Center, and DOES 1-25*, S.D. Cal. Case No. 3:12-cv-325 AJB (WVG).  [D.I., 5.1, p. 20.]  As set forth in MHP's Objection to CrossFit's Notice of Related Case, CrossFit's allegations are based on the claim that the defendants failed to discontinue use of the CrossFit Mark after the expiration of its license for use of the CrossFit Mark.  [D.I., 14.]  This is a completely different scenario than enforcement against different third party marks. Id.

CrossFit allows widespread third party use of its CROSSFIT Mark.  [Downs Decl., ¶100.]  CrossFit has allowed other supplement companies to use the CROSSFIT Mark without proper attribution, ownership, and disclaimer.  [Downs Decl., ¶101.]  CrossFit also allows athletes connected to CrossFit as competitors, instructors, and box owners to promote products, appear in videos, and use terminology and movements in connection with other products.  [Downs Decl., ¶102.]  See, for example, Labrada, BSN, Body Building, GNC, PurePharma, Blonyx, LiveStrong, Dymatize, Advocare, NetSupplements, and Optimum Nutrition.  [Downs Decl., ¶¶103-118, Exs. 64-78.]  As of October 24, 2012, a review of the PACER database revealed no lawsuits filed by CrossFit against any of these third parties.  [Larsen Decl., ¶58.]

2.     **Coexistence with Third Party X-FIT Marks**

CrossFit coexists with many "X-FIT" marks.  [Larsen Decl., ¶59.]  A Google search for XFIT yields 441,000 results and 29 results for various XFIT marks not associated with MHP or CrossFit in the first ten pages.  [Larsen Decl., ¶¶67-68, Ex. 32.]  A Google search for X-FIT yields 292,000,000 results with 28

11

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

1   results for various X-FIT marks not connected to MHP or CrossFit in the first ten

2   pages.  [Larsen Decl., ¶¶69-70, Ex. 33.]  Consistent with Mr. Saran's statements to

3   MHP and with the Saran Article, CrossFit does not challenge the widespread use

4   of X-FIT-formative marks.  [Downs Decl., ¶119.]  Numerous examples of X-FIT,

5   XFITRAINING, and X-FIT-formatives can be found.  [Downs Decl., ¶¶120-137,

6   Exs. 79-96.]  Most problematic, as Mr. Saran acknowledges, a registered mark for

7   X-Fit covering personal training services exists in direct competition with the

8   CROSSFIT Mark.  [Larsen Decl., ¶71.]  See Saran Article.  [Larsen Decl., ¶53, Ex.

9   24.]

10  **II.   ARGUMENT**

11        In order to obtain preliminary injunctive relief, a plaintiff "must establish

12  that he is likely to succeed on the merits, he is likely to suffer irreparable harm in

13  the absence of preliminary relief, that the balance of equities tips in his favor, and

14  that an injunction is in the public interest."  *Flexible Lifeline Sys., Inc. v. Precision*

15  *Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011) (*quoting Marlyn Nutraceuticals, Inc. v.*

16  *Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir.2009).

17        CrossFit cannot justify the extraordinary and broad relief it is seeking

18  because there is no likelihood of confusion between the marks and CrossFit cannot

19  prove its dilution claim.  Further, based on CrossFit's approval of MHP's use and

20  delay followed by its bad faith in filing for relief, CrossFit cannot show it will

21  suffer irreparable harm.

22  **A.      CrossFit is Not Likely to Prevail on the Merits**

23        A preliminary injunction is an "extraordinary and drastic remedy" and "one

24  that should not be granted unless the movant, by a clear showing, carries the

25  burden of persuasion." *Keep a Breast Found. v. Seven Group*, 2011 WL 2940290

26  (S.D. Cal. July 19, 2011) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972

27  (1997) (internal quotation marks omitted); *see also Marketquest Group, Inc. v. BIC*

28

**V E N A B L E  L L P**
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

12

1    *Corp.*, 2011 WL 5360899 (S.D. Cal. Nov. 7, 2009) (holding Defendant was likely

2    to succeed in asserting a fair use defense and thus denying Plaintiff's preliminary

3    injunction request); *see also Active Network, Inc. v. Electronic Arts Inc.*, 2010 WL

4    3463378 (S.D. Cal. Aug. 31, 2012) (finding a likelihood of confusion between "EA

5    SPORTS Active" and  "THE ACTIVE NETWORK" was too speculative to

6    warrant an injunction).

7          To prevail on a claim of trademark or trade name infringement under the

8    Lanham Act or common law, a plaintiff "must prove: (1) that it has a protectable

9    ownership interest in the mark; and (2) that the defendant's use of the mark is

10   likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys.*

11   *Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011) (*quoting Dep't of Parks & Rec. v.*

12   *Bazaar DelMundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).

13         Similar to the above cases and MHP's analysis as set forth below, a finding

14   of a likelihood of confusion between CROSSFIT and X-FIT is much too

15   speculative to warrant a preliminary injunction, and CrossFit cannot prove its mark

16   is famous.

17         **1.    CrossFit Cannot Satisfy the Ninth Circuit Likelihood of**

18              **Confusion Standard**

19         To determine whether a likelihood of confusion exists for a reasonable

20   consumer in the marketplace, the Ninth Circuit suggests consideration of the

21   following eight factors: (1) strength of the mark, (2) proximity of the goods, (3)

22   similarity of the mark, (4) evidence of actual confusion, (5) marketing channels

23   used, (6) type of goods and degree of care by purchaser, (7) the defendant's intent,

24   and (8) the likelihood of expansion of the product line. *AMF, Inc. v. Sleekcraft*

25   *Boats*, 599 F.2d 341 (9th Cir. 1979).  However, the Sleekcraft factors are non-

26   exhaustive and should be applied flexibly.  *Network Automation, Inc.* 638 F.3d at

27   1149.

28

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

13

6152873-v1

### i.   CrossFit is not a strong mark

The CROSSFIT Mark is not a strong mark.  In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd."  *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009) (*quoting Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114 (9th Cir. 1990)).  Use of similar marks by third-party companies in the relevant industry will weaken the mark at issue.  *Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883, 891 (N.D. Cal. 2010).  In *Rebelution*, defendants presented evidence that the mark at issue was weakened by third-party use by pointing to five other federal trademark registrations for the word "Rebelution" along with numerous other third-party uses. Id. at 892.  The court in *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214 (C.D. Cal. 2004) *aff'd*, 114 F. App'x 921 (9th Cir. 2004) denied Plaintiffs' motion for preliminary injunction finding a lack of confusion due in part to the fact that Plaintiffs' "Moose" mark operated in a crowded field thus making the mark weak.  Under the "crowded field doctrine," an arbitrary trademark, which would ordinarily be considered strong, may be classified as weak where there has been extensive third party use of similar marks on similar goods.  Id. at 1224.

In this case, MHP has demonstrated widespread use of the CROSSFIT and X-FIT marks.  [Downs Decl., ¶¶100-137, Exs. 64-96, Larsen Decl., ¶¶59-70, Exs. 25-33.]  There are a significant number of third parties with federally-registered rights for X-FIT that curtail the enforceable scope of CrossFit's mark.  For example, a registered X-Fit mark for fitness services, U.S. Reg. No. 3207654, is in direct competition with and in the same class of services as the CROSSFIT Mark.  Surely, if MHP's X-FIT mark for supplements infringes the CROSSFIT Mark, the X-Fit mark for fitness services must infringe.  [Larsen Decl., ¶62, Ex. 27.]  However, CrossFit cannot claim infringement of the other X-Fit mark because that mark has senior prior use.  As a result, CrossFit cannot claim that its rights extend

14

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA 90067
310-229-9900

1 to the X-Fit mark for goods or services that are not even in competition with it –to

2 do so would be an acknowledgment that it infringes the senior X-Fit mark.

3     Therefore, CrossFit's mark is weak and CrossFit is attempting to enforce it

4 in an extremely crowded field of more similar marks covering more similar goods

5 and services than MHP's.

6     **ii.    The proximity of the goods**

7     The proximity of goods is measured by whether the products are (1)

8 complementary; (2) sold to the same class of purchasers; and (3) similar in the use

9 and function. Network Automation, Inc., 638 F.3d at 1150.  In Network, the court

10 found this factor helpful because the products at issue were interchangeable, but

11 noted that it must be considered together with labeling and appearance and the

12 degree of care exercised by consumers of Plaintiff's software. Id.

13     Here, the goods and services are not similar.  CrossFit offers fitness services,

14 while MHP offers supplements.  MHP only sells supplements and has no plans to

15 expand and to compete directly with CrossFit.  [Downs Decl., ¶138.]  Although

16 MHP uses videos posted on the Internet, along with a number of other marketing

17 channels to promote and sell its products, MHP does not sell fitness services.

18 Further, Mr. Saran has publicly acknowledged that CrossFit does not have the right

19 to prevent registration and use of X-Fit for supplements or other goods in different

20 classes for which CrossFit has no intent to use its mark.  See Saran Article, p. 4.

21 [Larsen Decl., ¶53, Ex. 24.]  Therefore, this factor favors MHP.

22     **iii.    The lack of similarity of the marks favors MHP**

23     This factor is tested on three levels: sight, sound, and meaning. *Sleekcraft*,

24 599 F.2d at 351.  "The similarity of the marks will always be an important factor.

25 Where the two marks are entirely dissimilar, there is no likelihood of confusion."

26 *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (*quoting*

27 *Brookfield Commc'n, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th

28 Cir.1999)).  As admitted by CrossFit during the settlement negotiations and in Mr.

15

Saran's published article, CROSSFIT and X-FIT are not similar and X-Fit is entitled to separate trademark rights. Although both include the descriptive element "FIT", the dominant elements of the marks are "CROSS" and "X-", which are not similar in appearance or sound. While CrossFit provided one example of "X" meaning "Cross" in connection with road signs, MHP has provided an overwhelming number of examples where "X" means "Extreme" in the relevant sports and nutrition industry. Further, MHP uses the full word "Xtreme" on its website, advertising, videos, and its packaging to promote its supplement for "Xtreme Fitness Intensity Training".

Further, MHP's distinctive packaging, which includes blue and yellow coloring, its house mark in close proximity to the X-FIT Mark, the "FIT" superimposed over the "X", and the prominent slogan "Xtreme Fitness Intensity Training", further distinguishes the marks and lessons the possibility of any likelihood of confusion. [Downs Decl., ¶¶35-37, Exs. 24-25.] Therefore, the marks are not similar and this factor favors MHP.

### iv.     There is no evidence of actual confusion

Proving actual confusion is difficult and the courts have often discounted such evidence due to its lack of clarity or weakness. *Sleekcraft*, 599 F.2d at 352. The examples provided by CrossFit do not clearly identify actual confusion in the marketplace. Rather, they indicate that bloggers or commenters recognize that X-Fit is not associated with CrossFit.  Further, CrossFit does not provide survey evidence to support a likelihood of confusion claim.  MHP is not aware of and has no evidence of any actual confusion in the marketplace. [Larsen Decl., ¶72.] Therefore, there is no evidence of actual confusion and this factor weighs in factor of MHP.

### v.     The marketing channels used

Overlapping marketing channels increase the likelihood of confusion while marketing channels that do not overlap diminish the likelihood of confusion.  See

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

16

*Sleekcraft*, 599 F.2d at 353.  Today, however, because almost all commercial retailers advertise online, the shared use of an ever-present marketing channel does not shed much light on the likelihood of consumer confusion.  *Network Automation, Inc.*, 638 F.3d at 1152.  CrossFit argues that the use of the Internet to market the products and services supports overlapping channels.  This claim is far too broad.  Virtually every business includes some Internet presence so the parties' presence on the Internet is meaningless.  MHP markets and sells through traditional retail, within an MHP branded section, and via the Internet.  [Downs Decl., ¶40.]  At worst, this factor is neutral.

### vi.      The type of goods and degree of care by purchaser

Under this factor, likelihood of confusion is determined on the basis of the reasonably prudent consumer.  *eAcceleration Corp. v. Trend Micro, Inc.*, 408 F.Supp.2d 1110, 1119 (E.D.Wash. 2006).  The reasonably prudent consumer is expected to be more perceptive and less easily confused when purchasing expensive items. Id.  Memberships to a gym for CrossFit training are not inexpensive and likely involve a long term commitment.  The purchase of supplements to be used in connection with extreme training are not inexpensive, at approximately Fifty Dollars ($50.00) per bottle, and also requires some sophistication and education.  In fact, consumers tend to research supplements before taken them to ensure they know that the product is safe and beneficial. [Downs Decl., ¶139.]  Therefore, MHP submits that this factor also weighs in its favor because consumers will realize that MHP's supplements are from MHP and not CrossFit.

### vii.     The Defendant's intent favors MHP

When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose of deceiving the public. *Sleekcraft*, 599 F.2d at 354.  Despite CrossFit's incorrect statements about the history of this matter and attempt to color MHP's behavior as

17

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

1   "escalating" and in "bad faith", MHP did not select the X-FIT Marks in bad faith

2   and has been acting in good faith to attempt to resolve this matter with CrossFit.  In

3   fact, based on Mr. Saran's approval of MHP's use and agreement that this matter

4   was resolved, MHP believed that it had resolved all of CrossFit's concerns.  All of

5   the complained-of videos were posted by MHP many months ago, and were

6   presumably reviewed by CrossFit and approved almost two months before

7   CrossFit filed its Complaint.  If there is any bad faith, it is CrossFit's for approving

8   MHP's website content and then filing suit.

> **viii.   The likelihood of expansion of the product line favors MHP**

11   CrossFit alleges that MHP intends to compete directly with CrossFit.

12   However, that is simply not the case.  CrossFit offers fitness services, while MHP

13   offers supplements.  It sells approximately 100 different supplement products, and

14   has no plans to expand beyond supplements and to compete directly with CrossFit.

15   [Downs Decl., ¶138.]  Therefore, this factor tips in favor of MHP.  In contrast,

16   CrossFit has publicly stated that it has no intention of selling supplements and that

17   others have the right to register the X-Fit mark in classes other than CrossFit's.

18   See Saran Article, p. 4.  [Larsen Decl., ¶53, Ex. 24.]

19   Based on the above, the majority, if not all, of the SleekCraft factors tip in

20   favor of MHP and, therefore, CrossFit is not likely to succeed on its likelihood of

21   confusion claim.

> **2.   MHP's Use of the CROSSFIT Mark is Permissible Fair Use**

23   MHP's limited use on its website of the CROSSFIT Mark is permissible fair

24   use.  Courts recognize the defense of nominative fair use, where the defendant uses

25   a trademark to accurately describe the plaintiff's product rather than its own.  *New*

26   *Kids on the Block v. New America Pub., Inc*., 971 F.2d 302, 308 (9th Cir. 1992).

27   MHP's use of the term "CrossFit" is a nominative fair use.  In *New Kids on the*

28

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

18

6152873-v1

1  *Block*, the Ninth Circuit set the standard for analyzing a nominative fair use

2  defense:

> [A] commercial user is entitled to a nominative fair use defense
> provided he meets the following three requirements:  First, the
> product or service in question must be one not readily
> identifiable without use of the trademark; second, only so much
> of the mark or marks may be used as is reasonably necessary to
> identify the product or service; and third, the user must do
> nothing that would, in conjunction with the mark, suggest
> sponsorship or endorsement by the trademark holder.

8  *Id.*

9  MHP's use of the CROSSFIT Mark is analogous to the situation in *Playboy*

10  *Enterprises, Inc., v. Welles*, 279 F.3d 796 (9th Cir. 2002).  In *Playboy*, defendant

11  had been named "Playboy Playmate of the Year" in 1981 by the trademark owners

12  (PEI).  *Id.* at 803.  The court held that it was nominative fair use to thereafter use

13  the phrase "Playboy Playmate of the Year" to describe herself:

> The marks are clearly used to describe the title she received from
> PEI in 1981, a title that helps describe who she is. It would be
> unreasonable to assume that the Chicago Bulls sponsored a
> website of Michael Jordan's simply because his name appeared
> with the appellation "former Chicago Bull." Similarly, in this
> case, it would be unreasonable to assume that PEI currently
> sponsors or endorses someone who describes herself as a
> "Playboy Playmate of the Year in 1981."

19  *Id.*[4]  The use of the term CrossFit in connection with athletes used in videos

20  allows MHP to avoid manufacturing an absurd descriptive phrase which could not

21  similarly convey the same information as the single word "CrossFit" regarding

---

[4]     While not required, a disclaimer clarifying that defendant is not affiliated with or sponsored by the plaintiff is relevant to the nominative fair use analysis. *Toyota Motor Sales, U.S.A., Inc., v. Tabari*, 610 F.3d 1171, 1181-82 (9th Cir. 2010) (vacating and remanding the district court's injunction against defendant for infringement where defendant's website contained a disclaimer that it was not affiliated with the plaintiff's Lexus trademark).  The court in *Playboy* specifically observed that "in addition to doing nothing in conjunction with her use of the marks to suggest sponsorship or endorsement by PEI, Welles affirmatively disavows any sponsorship or endorsement.  Her site contains a clear statement *disclaiming any connection* to PEI." *Playboy Enterprises*, 279 F.3d at 803.  Likewise, MHP uses a disclaimer.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA 90067
310-229-9900

DEFT'S MEMO OF Ps&As IN OPPO TO PLTF'S
MOTION FOR PRELIMINARY INJUNCTION

6152873-v1

CrossFit competitors and trainers.[5]  CrossFit does not own any athletes and has no right to preclude athletes from endorsing X-FIT products.[6]  Athletes who have placed in CrossFit competitions cannot be clearly identified as such without use of the word "CrossFit," and this, along with the disclaimer and reasonably narrow use make MHP's use of the CROSSFIT Mark nominative fair use.  With respect to specific exercises, CrossFit simply does not own the exclusive right to use thrusters, perform burpees or other exercises.  It has no ownership rights in any exercises or routines and has provided no support for any such claim.

### 3.   CrossFit Cannot Prove Its Dilution Claim

"A plaintiff seeking relief under federal anti-dilution law must show that its mark is famous and distinctive, that defendant began using its mark in commerce after plaintiff's mark became famous and distinctive, and that defendant's mark is likely to dilute plaintiff's mark."  *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1089-90 (9th Cir. 2010).  CrossFit cannot prove dilution because it cannot prove that the CROSSFIT Mark is famous.  "[I]n order to be 'famous,' a mark must be 'widely recognized by the general consuming public of the United States' as a designation indicating the source of goods or services.  The mark must be famous to the whole consuming public of all of the United States….Fame in just one industry or line of business or only to professional buyers in one market niche is not sufficient."  4 McCarthy on Trademarks and Unfair Competition § 24:105 (4th ed.).[7]

---

[5]   As an example of a logical but "absurd descriptive phrase," the court reasoned that requiring Welles to describe herself as a "nude model selected by Mr. Hefner's magazine as its number-one prototypical woman for the year 1981" would be impractical as well as ineffectual in identifying Terri Welles to the public.

[6]  The banners indicating the name of the gyms in the complained-of videos were included in the videos at the request of the athletes, and the banners feature the name of the gym prominently and CrossFit incidentally.  [Larsen Decl., ¶73.]

[7]   Evidence of niche fame is not sufficient to prove fame in support of a dilution claim.  *See Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n*, 208 F. Supp. 2d 1058, 1077 (C.D. Cal. 2000) (holding that even if known in its "relevant trading area," plaintiff's composite mark was not famous for purposes of claim under Federal Trademark Dilution Act.); *see also Fruit of the Loom Inc., v. Girouard*, 994 F.2d 1359, 1362 (9th Cir.1993)

(continued…)

DEFT'S MEMO OF Ps&As IN OPPO TO PLTF'S
MOTION FOR PRELIMINARY INJUNCTION

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

6152873-v1

CrossFit has offered no proof of general fame, and cannot meet it burden of proof for a dilution claim. It has offered minor evidence of niche fame within its industry by claiming that there are 4,600 affiliates. That is hardly sufficient evidence that the general public considers the mark famous. It has produced no evidence whatsoever that the general public has any familiarity at all with the CROSSFIT Mark.

Thus, CROSSFIT is not a famous mark, and CrossFit cannot prevail on its dilution claim.

**B.    CrossFit is Unable to Prove Irreparable Harm**

In addition to failing to prove that it is likely to prevail on the merits of the case, CrossFit's Motion must be denied because it is unable to prove that it will suffer irreparable harm if its motion is denied. "Failure to show irreparable harm alone is sufficient to deny Plaintiff the extraordinary and drastic remedy of an *ex parte* application for a TRO and preliminary injunction." *ConocoPhillips Co. v. Gonzalez*, 2012 WL 538266 *4 (N.D. Cal. Feb. 17, 2012). Moreover, according to the Ninth Circuit, "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A [movant] must do more than merely allege imminent harm sufficient to establish standing; a [movant] must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *ConocoPhillips Co.* at *2 (*quoting Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir.1988). Under this standard, CrossFit has

(continued)

("FRUIT is far from being in the class" of TIFFANY, POLAROID, ROLLS ROYCE, KODAK, CENTURY 21, and OSCAR); see also *Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 858 (C.D.Cal.1985) ( "[t]he dilution doctrine is only available to protect distinctive marks as exemplified by such famous names as TIFFANY, POLAROID, ROLLS ROYCE, KODAK"); see also *Board of Regents, University of Texas System ex rel. University of Texas at Austin v. KST Elec. Ltd.*, 550 F. Supp.2d 657, 678 (W.D. Tex. 2008) (while the Univ. of Texas longhorn logo mark may be widely known among college football fans, it was not famous among the entire population of the United States, and summary judgment granted that the logo was not famous under the TDRA.).

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

DEFT'S MEMO OF Ps&As IN OPPO TO PLTF'S
MOTION FOR PRELIMINARY INJUNCTION

6152873-v1

1  failed to demonstrate that it has been injured or that there is an immediate threat to

2  injury.

3      CrossFit claims that it is suffering irreparably injury by exploiting its

4  goodwill, losing its ability to police and control its mark, actual confusion, and

5  dilution of its mark.  [D.I., 5.1, p. 21.]  If this is so, CrossFit has already suffered

6  by its own failure to police and control its mark as admitted by Mr. Saran during

7  then settlement negotiations and in his article.  There is widespread use of the

8  CROSSFIT and X-FIT marks, and the use of it by MHP is overshadowed by the

9  many other third parties using the mark.  [Downs Decl., ¶¶100-137, Exs. 64-96,

10 Larsen Decl., ¶¶59-70, Exs. 25-33.]  Additionally, CrossFit has not shown why

11 issuing a preliminary injunction now would prevent any irreparable harm to its

12 mark beyond the alleged "harm" that has already occurred.

13     Further, much of CrossFit's complained-of use by MHP has already been

14 addressed in good faith during the negotiations.  "Article III of the Constitution

15 prohibits courts from engaging in hypothetical or abstract legal disputes; courts

16 may decide only cases that present real and substantial controversies between

17 parties which can result in actual and adverse consequences." *Conant v.*

18 *McCaffrey*, 172 F.R.D. 681, 689 (N.D. Cal. 1997).  Therefore, CrossFit cannot

19 point to any actual harm, and the allegations it makes in the Motion regarding

20 MHP's use of CROSSFIT and X-FIT have either already been addressed by MHP

21 or were approved by CrossFit on August 1, 2012.

22     **C.     CrossFit Has Delayed in Seeking an Injunction**

23     Courts have generally held that "a delay in seeking injunctive relief will

24 undercut the presumption of irreparable harm in trademark cases." *eAcceleration*

25 *Corp,*. 408 F. Supp. 2d at 1122.  More significantly, courts in the Ninth Circuit

26 have held that delay alone is sufficient to deny a motion for preliminary injunction.

27 *See Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1118 (N.D. Cal.

28 2010).  For example, the court in *eAcceleration Corp.,* 408 F. Supp. 2d at 1122

22

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

1   found that eAcceleration had not clearly established the likelihood of confusion

2   element and, even assuming it had, eAcceleration's delay of over one year in

3   bringing this motion for a preliminary injunction reverses any presumption in its

4   favor.

5          Similarly, in *ConocoPhillips Co.,* 2012 WL 538266 at *3, the court

6   concluded that if plaintiff could wait eight months after becoming aware of the

7   alleged trademark infringement before filing a motion for preliminary injunction,

8   plaintiff could wait until defendant had an opportunity to be heard.  While the court

9   did appreciate the parties' attempt to resolve the matter through negotiation, it

10  nevertheless concluded that "[p]laintiff's delay in seeking a TRO and preliminary

11  injunction 'implies a lack of urgency and irreparable harm.'"  *Id.* (*quoting Oakland*

12  *Tribune, Inc. v. Chronicle Pub. Co., Inc.,* 762 F.2d 1374, 1377 (9th Cir.1985).  In

13  particular, the plaintiff first became aware of the alleged trademark infringement as

14  early as June 27, 2011, and plaintiff waited until February 3, 2012, to file its

15  complaint.  *ConocoPhillips Co.,* 2012 WL 538266 at *3.  Accordingly, the court

16  denied the plaintiff's motion for preliminary injunction.  *Id.* at *4

17         *Conoco Phillips Co.* is analogous to the instant matter.  Here, the parties

18  engaged in negotiations beginning in January 2012 and entered into an agreement

19  on August 1, 2012, regarding the use of the marks at issue.  Even more significant,

20  CrossFit, like ConocoPhillips, waited over nine months before filing the instant

21  motion.  Such a delay clearly "implies a lack of urgency and irreparable harm" and

22  without showing of immediate and irreparable injury, plaintiffs cannot prevail on

23  their motion for preliminary injunction.  Importantly, throughout the negotiations,

24  MHP made requested modifications to its website and cooperated with CrossFit.

25  CrossFit's Complaint and Motion were filed without warning and in bad faith.

26

27

28

6152873-v1

**D.     The Balance of Hardships and the Public Interest Do Not Favor CrossFit**

As stated above, "a preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542 (1987).

Allowing the instant motion would unduly burden MHP and provide substantial harm to its business.  Without use of videos to advertise its X-FIT supplements, MHP will be at a competitive disadvantage in selling its product. Additionally, the public would not benefit from a preliminary injunction.  "The public interest analysis for the issuance of a preliminary injunction requires [the court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1138 (9th Cir. 2011) (*quoting Cal. Pharmacists Ass'n v. Maxwell–Jolly,* 596 F.3d 1098, 1114–15 (9th Cir.2010)).   Moreover, "[t]he likelihood of confusion to consumers is the critical factor in [the] consideration" of harm to the public, as "[t]he public has an interest in avoiding confusion between two companies' products." *Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.,* 559 F.3d 985, 993 (9th Cir.2009).  Thus, since a likelihood of confusion is speculative at most, the public will not be harmed by denying the injunction.

Moreover, if a plaintiff fails to prove that he is likely to succeed on the merits of his trademark infringement claim, or that he will suffer irreparable harm if a preliminary injunction is not issued, "the Court need not balance the hardships potentially suffered by the parties if Defendants were enjoined, or whether an

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

6152873-v1

1   injunction would be in the interest of the general public." *Dahl v. Swift*

2   *Distribution, Inc.*, 2010 WL 1458957 *12 (C.D. Cal. Apr. 1, 2010).

3          Therefore, the absence of a likelihood of success on both CrossFit's

4   trademark infringement and dilution claims and CrossFit's lack of irreparable

5   harm, combined with the fact that CrossFit agreed to allow the content it now

6   alleges is infringing, drastically tips the scales in favor of MHP.

7   **III.   CONCLUSION**

8          For all of the above-mentioned reasons, MHP respectfully requests that the

9   Court deny CrossFit's Motion for Preliminary Injunction.

10

11  Dated:  October 26, 2012                VENABLE LLP

12                                          By:  /s/ Daniel S. Silverman

13                                               Daniel S. Silverman
                                            Attorneys for Defendant
14                                          MAXIMUM HUMAN
                                            PERFORMANCE, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**V E N A B L E   L L P**
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

DEFT'S MEMO OF Ps&As IN OPPO TO PLTF'S
MOTION FOR PRELIMINARY INJUNCTION

6152873-v1

## **CERTIFICATE OF SERVICE**

I certify that on October 26, 2012, pursuant to Federal Rules of Civil

Procedure, a true and correct copy of the foregoing document described as

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, was served on the

parties in this action via the Court's ECF System.

Dated:  October 26, 2012                    /s/ Daniel S. Silverman
                                            Daniel S. Silverman, Esq.

**V E N A B L E   L L P**
2049 CENTURY PARK EAST, SUITE 2100
LOS ANGELES, CA  90067
310-229-9900

DEFT'S MEMO OF Ps&As IN OPPO TO PLTF'S
MOTION FOR PRELIMINARY INJUNCTION

6152873-v1